IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHAWN JAMES,                          )
                                      )
                 Plaintiff,           )
                                      )
        v.                            )        2:08cv853
                                      )        **Electronic Filing**
DUQUESNE UNIVERSITY,                  )
a Pennsylvania Corporation,           )
                                      )
                 Defendant.           )

## OPINION

Shawn James ("plaintiff") commenced this personal injury action seeking redress for injuries sustained when he was shot after leaving a dance on Duquesne University's ("Duquesne" or "defendant") campus.  Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. The incident giving rise to the injuries for which plaintiff seeks redress occurred on Duquesne's campus in the City of Pittsburgh. This campus is located on forty-nine acres in

the Uptown neighborhood of Pittsburgh known as "the bluff."  It is bordered by, among other

areas, the Hill District and downtown Pittsburgh.

The Black Student Union ("the BSU"), a student organization registered with

Duquesne, decided to host a back-to-school dance on September 16, 2006.  The BSU's mission

is to provide charitable efforts throughout the area and to build a sense of community.  The

BSU had sponsored the dance on an annual basis in past years and the event was known as the

back-to-school "bash."[1]  It sponsored the dance in order to build a sense of community and

educate the broader campus about African-American culture.  In accordance with its past

practices, the BSU invited Duquesne students, their guests, students from neighboring

universities and colleges and their guests.

The BSU received money from Duquesne's program council to help pay for the dance.

The BSU arranged for the dance to be held in the ballroom of the Student Union building.  As

an official student organization, the BSU was required to follow Duquesne's established rules

and procedures regarding campus events.  This included complying with the policies and

procedures set forth in Duquesne's Spirit Leadership Manual.

Because an invitation was extended to students of neighboring colleges and

universities, the bash was advertised off campus.  Members of the BSU posted and passed out

flyers off campus, including in downtown Pittsburgh and the Hill District.  Members of the

BSU understood the bash to be open to the general public, not just to students and guests.  The

BSU charged an admission fee to the dance.

Because the dance was advertised off campus, the Spirit Leadership Manual required

that at least two university police officers be assigned to the dance in order to ensure proper

---

[1] No alcohol was served or permitted at the dance.

order and safety.  Leroy Johnson and Dennis Dixon, police officers from Duquesne's

Department of Public Safety, were assigned by Duquesne to provide security at the dance.

Richan Gaskins ("Gaskins"), a BSU board member, was stationed at the entrance to the

dance.  He was accompanied by two other BSU board members who assisted him with

security.  Gaskins perceived himself as "head of security" for the dance because he was there

to "maintain order at the entrance and to ensure that people paid their admission."  Statement

of Richan Gaskins (Doc. No. 80-2) at 30.  Other BSU board members were collecting the

admission fee.  Neither officer Johnson or Dixon were stationed at the entrance, but both

officers moved throughout the ballroom area during the dance, and one of the officers spent at

least a few minutes at the entrance.

Plaintiff was a student at Duquesne and varsity basketball player for the Duquesne

Dukes.  He and four other team members attended the dance as did Brittany Jones ("Jones"),

who was student at Duquesne and a member of the BSU.

Shortly before midnight, Jones received a telephone call from her former boyfriend,

Kenny Eason ("Eason").  After the call Jones left the dance to meet Eason and help him find a

parking space.  Eason was accompanied by Derek Lee ("Lee"), William Holmes ("Holmes")

and two other males.  Jones got into the car with Eason and they found a spot on Locust Street

in front of the undergraduate library.  On their way in to the dance Eason asked Jones whether

"they were patting down."  Jones understood Eason to be asking if anyone at the entrance of

the dance was patting down for weapons.  Jones replied that she did not know.

When Jones and the Eason group arrive at the entrance to the ballroom, Jones

approached Gaskins and asked whether they were "patting down."  Jones knew Gaskins: they

had socialized in the past and done things together such as eat lunch and walk around

downtown Pittsburgh.  Gaskins told her that he was not "patting down" and then asked in a joking manner if she was carrying "mace or something."  Jones was not standing next to Eason or his group when she made this inquiry.  Gaskins was the only one at the entrance, and there was no officer or other security personnel standing next to him.  Jones did not see any security personnel in the area.  Jones turned around, looked at Eason and shook her head "no."  There is no evidence that Gaskins saw Jones shake her head.  Shortly thereafter, the Eason group entered the ballroom.  When the Eason group entered there were no uniformed officers or security personnel at the entrance.

At approximately 2:00 a.m. the dance ended and the attendees began to leave the ballroom.  No fights, altercations or confrontations occurred during the dance or when the students and their guests were exiting the Student Union.

Plaintiff and his teammates exited the Student Union and proceeded onto Academic Walk heading towards the dormitory area.[2]  They discussed going to one of their dorms.  As they were walking, one of plaintiff's teammates started talking with a young female named Erica Sager ("Sager").  Plaintiff observed his teammate's interaction with Sager because he was walking behind them.  Sager was being "real flirtatious" and plaintiff could tell from her body language and laugh that she "just . . . wanted to hang around the athletes."

As plaintiff and those with him progressed down Academic Walk toward the end of the football field,  plaintiff heard the Eason group call Sager over.   The Eason group was standing ahead of plaintiff and his teammates.  Holmes and Lee were in the Eason group.  Sager ran ahead of the basketball players and to the Eason group.  Plaintiff heard one of the guys in the

---

[2] Academic Walk is a roadway down through campus that leads to the dorms on one end and the Bayer Science Building and the Law School on the other.  It is flanked by several buildings and the football field.

Eason group yell at Sager and ask her "what the hell you doing with those guys " and  "what

the fuck you talking to them for."   Plaintiff believed the guys were ". . . really jealous, angry at

[Sager] for talking to – or just walking with us . . . ."  Plaintiff and his teammates continued

walking on Academic Walk towards the dorms.  Sager and the Eason group were still ahead of

them.

As plaintiff and his teammates proceeded the Eason group started to argue and curse at

them.  At least one of the teammates started to argue back.  Plaintiff cautioned his teammates

that they needed to maintain their composure because there could be repercussions if they were

in a fight on campus.  Plaintiff nudged one of his teammates and they then began to walk away

by continuing down Academic Walk.  Holmes and Lee pulled out handguns and opened fire on

the basketball players.  The shooting took place near or in front of the Duquesne Towers, one

of the dormitories on campus, which is over 200 yards from the Student Union.

Plaintiff and four of his teammates were shot.  Plaintiff was hit in the left foot with two

bullets, causing him significant injuries and scaring.  Plaintiff had to undergo surgery to have

one of the bullets removed, which appeared to be from a 9mm handgun.  He did not play in any

games during the following basketball season, which was slated to be his "red shirt" year for

drafting into the National Basketball Association.  The injuries have had a detrimental effect on

plaintiff's professional basketball career and resulted in a significant decrease in his earning

capacity.

The Duquesne Public Safety officer in charge of the night shift was Sergeant Daniel

Churma ("Churma").  Churma identified four other officers who were on campus that night:

Corporal Williams, Officer Latuszewski, Officer Good, and Officer Stivenson.  Officer

Stivenson was assigned to dispatch because he was on light duty.   In addition, Security Guard

Wade was on duty and off-duty officers Johnson and Dixon were assigned to cover the dance. Johnson did not report until 11:00 p.m. because he was working an earlier shift. Johnson and Dixon were in uniform.

Churma met with Corporeal Williams and Officer Good shortly before the dance ended and instructed them to move their vehicle onto Academic Walk. They were in a marked patrol unit and Churma wanted them to be present as the crowd was moving across campus and dispersing. Churma and Johnson were further down on Academic Walk in a separate unit. Churma and Johnson got out of their unit and were on foot on Academic Walk. Churma and Johnson walked up where Willaims and Good were and after they moved with the crowd for a bit Churma directed them to take their unit toward "upper Magee Street at the end of Academic Walk." He wanted them near that location on Academic Walk as the crowd was moving there. He expected Willaims and Good to get out of their unit when they got there. Churma and Johnson continued to walk on Academic Walk back toward their unit. They walked just behind the crowd as it moved toward flag plaza and the dorms. When Churma heard the shots he and Johnson were more than 150 feet from where the shooting occurred and they could not see that end of Academic Walk from where they were positioned. There were no police in the dormitory area at the time the shooting occurred, which was an area right at the dorms where students gathered to either take transportation to the Oakland area of Pittsburgh or enter into the dorms.

The 11:00 p.m. to 4:00 a.m. time period was considered to be a key time for crime during the late shift. Duquesne's guidelines for safety and security generally called for seven officers and one security guard during the 11:00 pm to 7:00 am shift. There were only four on-

duty officers during that shift.  With the addition of Johnson and Dixon, there were six officers and one security guard present during the late shift.

Holmes and Lee pleaded guilty to multiple offenses, including aggravated assault and criminal attempt with the intent to commit the crime of criminal homicide.  Both Holmes and Lee were sentenced to multiple years in the state penitentiary.  Jones pleaded guilty to recklessly endangering another person, a second degree misdemeanor under Pennsylvania law.  Sager pleaded guilty to a charge of  riot/intent to commit a felony, a third degree felony under Pennsylvania law.

Duquesne has sought to maintain a comprehensive system to provide security for the students, faculty and visitors on its campus.  The Mission Statement for the Duquesne University Department of Public Safety acknowledges the University's goal to anticipate and prevent unsafe conditions on campus and protect individuals from "the imprudent or illegal acts others."  In order to meet these goals,  Duquesne had annually increased its budget for campus security/safety from $1,524,493.53 in 2003 to $1,762,164.06 in 2006.

The measures employed as part of the system included among other things a state-certified police force, direct radio contact with the Pittsburgh Police and emergency medical service responders, surveillance cameras,  six "blue code" emergency stations that directly connect to campus police, 24-hour escort services, extended security in on-campus residency halls and safety training for the members of Duquesne's police force.

Duquesne's police force is manned by twenty-seven full time police officers, five security guards, six communications operators and several office workers.  The full time officers consist of one director, one assistant director, three lieutenants, two detectives, and twenty officers.  The officers are required to have completed police academy training and

8

obtained Pennsylvania's Act 120 certification.  They are required to keep up on both mandated and other yearly training.  The security guards are required to have Act 235 certification and 40 hours of approved security officer training as well as forty hours of onsite training with the campus police department.

Duquesne's system included an array of electronic devices.  Duquesne's security cameras included pan-tilt-zoom and stationary models and covered numerous areas, including Vickroy Hall where the shooting occurred.  The campus also had "ring down" telephones in elevators, parking kiosks, academic buildings, most residence halls and the main-campus buildings.  The dorms were equipped with electronic reader card systems and students are permitted to swipe into only the residence hall in which they live.  Also, the main residence halls were monitored by representatives of Duquesne's Office of Residency Life.

Duquesne is required to report on-campus crime statistics pursuant to the Clery Act, 20 U. S. C. § 1092(f).  The statistics indicate that from 2003 through 2005 Duquesne experienced zero crimes within the "murder/non-negligent manslaughter" category.  It did experience four crimes within the "aggravated assault" category.

Two of the four incidents within 2003-2005 aggravated assault statistics involved handguns.  First, on August 23, 2004, an individual was involved in an argument with a cab driver outside Brottier Hall (a campus dorm) because the cab driver was blocking the entrance to the dorm. The argument culminated in the individual brandishing a handgun and firing a shot at the victim, and then striking the victim in the face with the gun before leaving the scene.  The perpetrator was charged with aggravated assault.  He pled guilty to recklessly endangering another person and simple assault and received four years probation.

Second, on September 15, 2005, five juveniles who were not affiliated with Duquesne were apprehended by Duquesne police after stealing items from a campus store. During their arrest the police discovered one was carrying a handgun. The perpetrator was charged with possession of a firearm by a minor.

Neither party has provided further detail about the other two incidents. Defendant asserted in its concise statement that prior to September 17, 2006, it had never experienced an on-campus incident akin to the shooting and none of the four prior incidents of aggravated assault were even remotely similar to it. Plaintiff referenced only the summaries of the August 23, 2004, and September 12, 2005, incidents to dispute these assertions. Under this court's local rules, assertions of fact not controverted by the opposing party are deemed to be admitted. See Local Rule 56E. It follows that the other two incidents did not involve handguns or criminal conduct similar to the shooting.

Duquesne's campus is located in Zone 2 of the City of Pittsburgh. Plaintiff's Brief in Opposition (Doc. 80) at 17 (citing Okopal Deposition at 37: 9-10). Zone 2 is much larger than Duquesne's campus and includes a number of other different sections and neighborhoods of the City.

Based on Zone 2 statistics, plaintiff's expert "examined the CAP Index analysis of crime with Duquesne University as the focal point."[3] He compared a 1999 study that ranked colleges and universities and placed Duquesne in the lower quadrant, which signified "a higher than average risk of crime when compared to the dataset of colleges and universities." He then examined the same CAP Index Risk Analysis for 2000 and 2006 "and found little change in the

---

[3] According to plaintiff's expert, the CAP Index is a nationally recognized crime analysis and forecasting organization that is used by experts in litigation involving claims of premises liability or inadequate security.

10

overall crime risk at Duquesne University."  He opines that the CAP Index in 2006 reported (1) the overall risk of crime in the Duquesne University area is 9.81 higher than the same risk for all of Allegheny County, (2) the overall risk in the Duquesne University area is 6.39 times higher than the same risk throughout Pennsylvania, (3) the overall risk of aggravated assault is 5.92 times higher in the Duquesne University area than the same risk for all of Allegheny County; and (4) the overall risk of aggravated assault in the Duquesne University area is 3.26 times higher than the same risk throughout Pennsylvania.

Defendant filed its renewed motion for summary judgment after Judge Folino of the Court of Common Pleas of Allegheny County granted summary judgment to defendant in the related case of Biodun Adewumi Sam Ashaolu v. Duquesne University of the Holy Spirit, et al., 2010 Pa. Dist. & Cnty. Dec. LEXIS 231 (June 10, 2010), and the Superior Court affirmed that decision.  2012 Pa. Super. LEXIS 1142 (Pa. Super. Ct., Mar. 27, 2012) (non-precedential opinion re-produced at 2:08cv853, Doc. No. 68-3).  The parties present their respective positions based on their perception of the impact and persuasiveness the state court decisions should have on this court.

Sam Ashaolu was one of the five Duquesne basketball players who were shot on September 17, 2006, at 2:15 a.m. on defendant's campus.  The Ashaolu case was one of four cases (one state and three before this court) in which discovery was jointly consolidated and coordinated.[4]  Over twenty depositions of Duquesne personnel were jointly taken for both/all actions.  Defendant's motions for summary judgment in this and the Ashaolu case were/are nearly identical.  As one might anticipate, defendant argues that the outcome of the Ashaolu litigation is the death knell to plaintiff's claims; plaintiff argues that the Superior Court misread

---

[4] The other two related cases before this court are: Mensah v. Duquesne University, 2:08cv852 and Baldonado v. Duquesne University, 2:08cv1221.

the record and committed multiple errors in reaching its decision, rendering its assessments unreliable and unpersuasive.

In moving for summary judgment defendant maintains that plaintiff cannot establish that it owed a duty to protect plaintiff from such spontaneous criminal shootings or to prevent third parties from engaging in the type of felonry that befell plaintiff.  It notes the general rule laid down by the Pennsylvania Supreme Court that a person cannot be held liable for the criminal acts of third parties.  It asserts it did not assume any obligation to prevent the shooting simply by undertaking to provide campus security for its students; it did not establish or stand in a special relationship with plaintiff; and even if such a relationship existed, it did not know or have reason to know that criminal shootings were occurring or about to occur on campus in any event.  Thus, defendant contends that plaintiff cannot establish that it owed a duty under sections 323 or 314A of the Restatement (Second) of Torts, which provide exceptions to the general rule;  therefore, the general rule bars plaintiff's attempts to establish that defendant owed him a duty.

Defendant also argues it is entitled to summary judgment because plaintiff cannot establish a causal link between defendant's conduct and the injuries he sustained.  It notes that no fights, altercations, arguments or other tumultuous behavior occurred at the dance and there had not been any incidents on campus akin to a criminal shooting involving an attempted criminal homicide.  Plaintiff was shot by third-parties who were not affiliated with Duquesne University after he left the dance and traveled approximately 200 yards down Academic Walk.  The perpetrators' conduct constituted the commission of violent felonious acts.  Defendant thus argues that as a matter of law these undisputed facts preclude plaintiff from establishing that it caused plaintiff's injuries.

Plaintiff asserts that defendant owed him a duty to provide security on two separate levels and it breached that duty by failing to follow its own standards and guidelines governing events such as the college bash. A duty assertedly arose under section 323 of the Restatement because defendant undertook to provide security on campus and at the dance; a duty likewise arose under section 314A(3) of the Restatement because defendant opened its campus to the public and in doing so was required to take reasonable action to protect against the unreasonable risk of physical harm. Defendant was well aware of a risk of criminal conduct on campus as a result of prior incidents and understood that opening events up to the public increased the likelihood that a criminal element would be present. Defendant assertedly breached its duty by having fewer officers on campus that night than its own guidelines required, not having a sufficient number of officers present on Academic Walk when the crowd was leaving the dance or at the location where the largest number of students typically traversed to their dorms or gathered for transportation. It also failed to employ reasonable measures to abate the risk of a criminal element, including failing to (1) utilize handheld metal wands, (2) provide any security training or instruction to the students assisting with the dance, (3) have more officers and/or security guards on duty, and (4) have officers visible from all points along Academic Walk as the crowd was dispersing; it also failed to abate this risk by permitting a BSU member to act as "head of security" at the entrance to the dance.

Plaintiff further maintains that the breach of these duties purportedly caused his injuries because the shooters were permitted on campus and inside the dance; and had they been denied access as a result of proper security, they would have left and no argument or shooting would have occurred as the crowd was dispersing. Because the failure to provide proper security led to Holmes and Lee entering the dance with loaded guns, plaintiff maintains it was reasonably

13

foreseeable that the shooting would occur, and because the area in front of the dorm was known to be one of the busiest on campus after events such as the dance, plaintiff argues that it was foreseeable that a fight or altercation might occur at that location.  It also was foreseeable that the lack of uniformed officers present at that location would result in the escalation of any such argument or altercation.  Because it was reasonably foreseeable that defendants' breaches could easily lead to the shooting, the criminal element of Holmes and Lee's conduct does not break the causal chain between defendant's failure to provide adequate security and plaintiff being shot.  In other words, plaintiff asserts that defendant's negligence was a proximate cause of his injuries.

It is well established that a federal court exercising diversity jurisdiction must apply the substantive law of the appropriate state.  In the absence of a definitive ruling by a state's highest court, the federal court must predict how that court would rule if faced with the legal issues. Covington v. Continental General Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004) (citing Packard v. Provident Nat. Bank, 994 F.2d 1039, 1046 (3d Cir.1993)); accord Wiley v. State Farm Fire and Casualty Co., 995 F.2d 457, 459 (3d Cir. 1993) (in the absence of established precedent on an issue of state law, the district court must predict how the Supreme Court of Pennsylvania would rule on the question); Official Committee of Vasecure Creditors v. R. F. Lafferty & Co., 267 F.2d 340, 349 (3d Cir. 2001) (in the absence of state appellate authority directly addressing the issue raised, "we must don the soothsayer's garb and predict how [the Supreme Court of Pennsylvania] would rule if it were presented with the question.").  "In carrying out that task, [the court] must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." Covington, 381 F.3d at 218; see also Wiley, 995 F.2d at 459-60; Buczek v. Continental Casualty Ins. Co., 378 F.3d 284, 288 n. 2 (3d Cir. 2004).

14

The decision of an intermediate state court is particularly relevant and "is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Covington, 381 F.3d at 218 (citing C.I.R. v. Bosch's Estate, 387 U.S. 456, 465 (1967)).  Thus, in resolving the questions posed by defendant's summary judgment motion we must predict whether the Supreme Court of Pennsylvania would uphold or otherwise follow the Superior Court's resolution of the legal issues in Ashaolu or resolve them differently under Pennsylvania law and/or due to the factual record before this court.

It is elementary that a plaintiff in a negligence action must establish the following: "(1) the existence of a duty or obligation recognized by law; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant." T.A. v. Allen, 669 A.2d 360, 362 (Pa. Super. 1995); see also Morena v. South Hills Health System, 462 A.2d 680, 684 fn. 5 (Pa. 1983).   Defendant's contentions primarily raise issues regarding the elements of duty and causation.

The initial inquiry in a negligence action is whether the defendant owed a duty of care to the plaintiff.  R. W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005) (citing Althaus v. Cohen, 756 A.2d 1166, 1168 (2000) and Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994) ("Any action in negligence is premised on the existence of a duty owed by one party to another")).  "The existence of a duty is a question of law for the court to decide." Id. (citing Emerich v. Philadelphia Center for Human Dev., Inc., 720 A.2d 1032, 1034 (Pa. 1998); Huddleston v. Infertility Center of Am., Inc., 700 A.2d 453, 457 (Pa. Super. 1997)).  "In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for the protection of another." Id. (citing Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002)).

Whether a duty properly exists or should be recognized is rooted in public policy.  Id. (citing Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 280 (Pa. 2005)).  In Althaus, the Pennsylvania Supreme Court summarized the traditional public policy considerations involved in assessing the existence of a duty of care as follows:

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered . . . .  To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows: "These are shifting sands, and no fit foundation.  There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it.  Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question.  When we find a duty, breach and damage, everything has been said.  The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none.  In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss shall fall.  In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'"

Althaus, 756 A.2d at 1168-69 (quoting William L. Prosser, Palsgraf Revisited, 52 Mich. L. Rev. 1, 14-15 (1953)).  The court further opined that "whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution."  Id. at 1169 (citing Dumanski v. City of Erie, 34 A.2d 508, 509 (Pa. 1943) (relationship between the parties), Forster v. Manchester, 189 A.2d 147, 150 (Pa. 1963) (social utility), Clewell v. Pummer, 121 A.2d 459, 463 (Pa. 1956) (nature of risk), Witthoeft v. Kiskaddon, 733 A.2d 623, 630 (Pa. 1999) (foreseeability of harm),

Cruet v. Certain-Teed Corp., 639 A.2d 478, 479 (Pa. Super. 1994) (relationship, nature of risk

and public interest in the proposed solution) and Bird v. W.C.W., 868 S.W.2d 767, 769 (Texas

1994) ("In determining whether to impose a duty, this Court must consider the risk,

foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct,

the magnitude of the burden of guarding against the injury and the consequences of placing that

burden on the actor.")).

 Of course, where there is no duty there can be no negligence.  Maxwell v. Keas, 639 A.2d

1215, 1217 (Pa. Super. 1994).  In other words, "[b]efore a person may be subject to liability for

failing to act in a given situation, it must be established that the person has a duty to act; if no

care is due, it is meaningless to assert that a person failed to act with due care." Wenrick v.

Schloemann- Siemag Aktiengesellschaft, 564 A.2d 1244, 1248 (Pa. 1989).

 As the plaintiff did in Ashaolu, plaintiff frames his arguments about the existence of a

duty under the generic contention that defendant had a duty to provide security to those who

were on its campus.  Specifically, plaintiff argues that Pennsylvania has adopted section 323 of

the Restatement and defendant has expressly undertaken to provide security for the students,

faculty and visitors on its campus.  In support of this position plaintiff notes the broad and noble

purpose of the Duquesne University Department of Public Safety to serve and protect the

University community and its commitment to anticipate and prevent "unsafe conditions and

protect[] individuals from the imprudent or illegal acts of others."  He further draws support from

the fact that the BSU was required to obtain  approval for the dance in advance so that security

officers would then be able to cover the bash.

 In other words, plaintiff attempts to define the duty defendant owed as one to provide

security to students on campus either as a result of its own voluntary undertaking to do so or as a

consequence of it permitting the BSU to invite third parties onto campus.  He then points to myriad ways a finder of fact could conclude that defendant breached that duty through the various means it employed or could have but failed to employ on the night in question.

Plaintiff's attempt to define defendant's duty in such a manner begs the question.  If this were all that is required, the concept of duty would collapse into itself and defendant would effectively become an insurer of all who enter upon its premises either as a student or as a guest of one.  Pennsylvania law stops far short of supporting such a proposition.  As Judge Aldisert recognized some time ago:

> [T]he statement that there is or is not a duty begs the essential question, which is whether the plaintiff's interests are entitled to legal protection against the defendant's conduct . . . .  Thus, we may perceive duty simply as an obligation to which the law will give recognition in order to require one person to conform to a particular standard of conduct with respect to another person.
> These abstract descriptions of duty cannot be helpful, however, unless they are directly related to the competing individual, public and social interests implicated in any case . . . .
> Our beginning point is a recognition that the modern American college is not an insurer of the safety of its students.  Whatever may have been its responsibility in an earlier era, the authoritarian role of today's college administrations has been notably diluted in recent decades.  Trustees, administrators, and faculties have been required to yield to the expanding rights and privileges of their students.

Bradshaw v. Rawlings, 612 F.2d 135, 138 (3d Cir. 1979); accord Alumni Ass'n v. Sullivan, 572 A.2d 1209, 1213 (Pa. 1990) ("We thus conclude that the modern perception of the relationships between the University and their students, and the respective units of fraternal organizations is totally antithetical to the heightened duty we are here being importuned to accept."); Millard v. Osborne, 611 A.2d 715, 721 (Pa. Super. 1992) ("Clearly, in modern times, it would be inappropriate to impose an *in loco parentis* duty upon a university.").

Because defining defendant's duty as one "to provide security" does not entail adequate consideration of the appropriate legal interest for which protection is sought, the obligation to be

18

imposed upon defendant, the foreseeability of the harm and so forth, plaintiff's thinly veiled

attempt to define defendant's duty in terms of what plaintiff's evidence of a "breach" will support

must be rejected.  It is clear that the issue of duty must at the very least be assessed pursuant to

the circumstances under which the interest sought to be protected was invaded and the injury or

harm that occurred.  Thus, the relevant inquiry is whether defendant had a duty to prevent or

protect plaintiff from the spontaneous, criminal shooting that occurred on September 17, 2006,

under the then-existing circumstances.  In other words, did defendant have a duty to protect

plaintiff from Holmes and Lee's confrontation and open fire on Academic Walk at 2:15 a.m after

the dance was over and he had traversed on campus property with others in the exiting crowd for

some distance from the Student Union?

　　　Plaintiff first contends that defendant had a legal duty under section 323 of the

Restatement (Second) of Torts.  Section 323 of the Restatement provides:

　　　§ 323. Negligent Performance of Undertaking to Render Services

　　　　One who undertakes, gratuitously or for consideration, to render services to
　　　　another which he should recognize as necessary for the protection of the other's
　　　　person or things, is subject to liability to the other for physical harm resulting
　　　　from his failure to exercise reasonable care to perform his undertaking, if

　　　(a) his failure to exercise such care increases the risk of such harm, or

　　　(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.  Section 323 of the Restatement has been adopted in

Pennsylvania.  See, e.g., Spence v. ESAB Grp. Inc., 623 F.3d 212, 217 (3d Cir. 2010) (citing

Gradel v. Inouye, 491 Pa. 534, 421 A.2d 674, 677 (1980)).

　　　The leading Pennsylvania case is Feld v. Merriam, 485 A.2d 742 (Pa. 1984).  There, the

plaintiffs were tenants in a large apartment complex which included the use of adjacent parking

garages for an additional fee.  They were abducted at gunpoint by three felons in a parking

garage one evening when returning from a social engagement.  <u>Id.</u> at 744.  The felons forced the

plaintiffs into the back seat and then escorted them at gun point past the guard at the gated

entrance.  After Mrs. Feld successfully begged for her husband's life at the expense of her

"defenseless innocence," the felons abandon Mr. Feld on a deserted street corner and proceeded

to the lonely precincts of a court club where the felons exhorted a terrible penalty from Mrs. Feld

for Mr. Feld's release.  <u>Id.</u> at 744.  The plaintiffs subsequently brought an action against the

owners of the apartment complex/garage.  <u>Id.</u> at 744-45.  They obtained a sizable verdict at trial

and the Superior Court affirmed except as to a punitive damage award for Mr. Feld, which it

reduced by 50 percent.  All parties appealed.  <u>Id.</u> at 745.

The Superior Court had "departed from the traditional rule that a person cannot be liable

for the criminal acts of third parties when it held 'that in all areas of the leasehold, particularly in

the area under his control, the landlord is under a duty to provide adequate security to protect his

tenants from the foreseeable criminal actions of third persons.'"  <u>Id.</u> at 746 (quoting <u>Feld v.</u>

<u>Merriam, et al.</u>, 461 A.2d 225, 231 (Pa. Super. 1983)).  The Superior Court had viewed its ruling

"as merely an extension of the landlord's existing duty to maintain the common areas to be free

from the risk of harm caused by physical defects."  <u>Id.</u>

The Supreme Court of Pennsylvania reversed the Superior Court's holding and rejected its

reasoning because it "failed to recognize the crucial distinction between the risk of injury from a

physical defect in the property, and the risk from the criminal act of a third person."  <u>Id.</u>  It

explained that the rule that holds landlords to a duty to protect tenants from injury due to the

negligent failure to maintain the premises in a safe condition is addressed to a failure of care

caused by the landlord's "own negligence, a condition, the cause of which was either known or

20

knowable by reasonable precaution." Id. at 745.  In that setting "the landlord has effectively

perpetuated the risk of injury by refusing to correct a known and verifiable defect." Id. at 746.

In sharp contrast, "the criminal acts of a third person belong to a different category and

can bear no analogy to the [unsafe condition] or the other myriad possibilities of one's personal

negligence." Id. at 745.  This liability arises "not from the conduct of the landlord but from the

conduct of an unpredictable independent agent." Id. at 746.  To recognize a general duty in such

a setting "would effectively require landlords to be insurers of their tenants safety: a burden

which could never be completely met given the unfortunate realities of modern society." Id.

Accordingly, liability for such acts "can only be a judicial rule for given limited circumstances."

Id. at 745.

The Court contrasted the situation before it to landlords who hold their property open to

the public for business purposes.  In that setting liability can be imposed for intentional acts of

others for failing to take reasonable precautions against what can reasonably be expected; and

because places of "general public resort are also places where what men can do, they might," and

one who invites all may reasonably expect that all might not behave, the landowner in public

business "bears responsibility for injury that follows the absence of reasonable precaution against

that common expectation." Id. at 745.

In comparison, "the common areas of an apartment complex are not open to the public,

nor are the general public expected or invited to gather there for other purposes than to visit

tenants." Id.  Use of property for rental purposes is not akin to "a place of public resort where

one who profits from the very public it invites must bear what losses that public may create.  It is

of its nature private and only for those specifically invited."  To impose the same duty in such a

setting would be divorced from the fact that "[t]he criminal can be expected anywhere, any time,

21

and has been a risk of life for a long time.  He can be expected in the village, monastery and the castle keep." Id.  In other words, the extension of responsibility for intentional criminal acts into that setting would effectively make landlords insurers of tenant safety without a corresponding common expectation that such behavior likely will occur because of the general profit-based business purpose to which the property has been put.  Id. at 745-46.

Nevertheless, the general rule that a landlord is not liable for the criminal acts of others absent a preexisting duty is subject to the exception captured in section 323 of the Restatement. That section imposes liability "where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage." Id. at 746 (citing Pascarella v. Kelley, 105 A.2d 70 (Pa. 1954) and Rehder v. Miller, 35 Pa. Super. 344 (1908)).  The drafters of section 323 intended it to apply

> to any undertaking to render services to another which the defendant should
> recognize as necessary for the protection of the other's person or things.  It applies
> whether the harm to other or his things results from the defendant's negligent
> conduct in the manner of his performance of the undertaking, or from his failure
> to exercise reasonable care to complete it or to protect the other when he
> discontinues it.

Id. (quoting Comment (a) § 323 Restatement (Second) of Torts).  These comments are particularly relevant to the section's application to a landlord who "undertakes to secure the areas within his control and possibly fosters a reliance by his tenants on his efforts." Id. at 747.

So, in Pennsylvania there is no general duty on a landlord to protect tenants against criminal intrusion.  Id.  But a landlord can incur such a duty

> voluntarily or by specific agreement if to attract or keep tenants he provides a
> program of security.  A program of security is not the usual and normal
> precautions that a reasonable home owner would employ to protect his property.
> It is . . . an extra precaution, such as personnel specifically charged to patrol and
> protect the premises.  Personnel charged with such protection may be expected to

22

> perform their duties with the usual reasonable care required under standard tort law for ordinary negligence.  When a landlord by agreement or voluntarily offers a program to protect the premises, he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable.

Id. at 747.  The duty is one of reasonable care under the circumstances and not that of an insurer.

Id.  There must be a reasonable expectation of the harm and a landlord is not liable unless his failure is the proximate cause of it.  Id.

The tenant's ability to rely on any particular program of security is limited to the reasonable expectations created by that program.  A tenant cannot expect the landlord to defeat all forms of felony.  He can only expect that what has been offered will be reasonably pursued and will not fail due to its negligent performance.  In other words,

> [i]f a landlord offers protection during certain periods of the day or night a tenant can only expect reasonable protection during the periods offered.  If, however, during the periods offered, the protection fails by a lack of reasonable care, and that lack is the proximate cause of the injury, the landlord can be held liable.  A tenant may not expect more than is offered.  If, for instance, one guard is offered, he cannot expect the same quality and type of protection that two guards would have provided, nor may he expect the benefits that a different program might have provided.

Id. at 747.  In short, the tenant "can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care."  Id.

Pennsylvania's intermediate courts have heeded the restrictive teachings laid down in Feld.  In Kerns v. Methodist Hospital, 574 A.2d 1068 (Pa. Super. 1990), the plaintiffs sought to recover in negligence after William Kerns ("Kerns") was robbed at gun point and assaulted on hospital property in South Philadelphia.  They sued the hospital and a private security company that had been hired to guard the hospital grounds.  Id. at 1070.

Kerns was a pizza deliveryman who was directed to deliver a pizza to the nurses' residence inside the hospital's grounds.  Kerns had made deliveries to the nurses' residence on four or five occasions in the past.  The residence was located in a private area that was gated.  On these prior occasions Kerns would drive up to the gate and blow his horn.  A security guard would come to the gate, Kerns would announce his purpose for entering and then he would be permitted to drive to the residence and deliver the pizzas.

At 7:00 p.m. on the night in question Kerns approached the gate and sounded his horn. The guard failed to appear.  Kerns decided not to wait.  He backed his car into the street and parked on a nearby side street.  It was dusk.  He walked around the gate and a short distance to the nurses' residence.  He delivered the pizza and was paid.  Kerns counted the money and put it in his pocket.  He then left to return to his car.

After walking merely 25 feet from the building Kerns was assaulted by two assailants. One poked a gun in his ribs and the other stood in front of him and demanded his valuables. Kerns tendered his wallet and then was kicked in the groin and punched as he fell to the ground. Id. at 1070.

The plaintiffs contended that the defendants voluntarily assumed a duty to protect Kerns by instituting a program of security on hospital grounds.  Id. at 1075.  He submitted an expert report outlining the key components needed to establish a security system that would be effective such as additional staffing, training and the use of simple security devises including lights, secure fencing, closed circuit television and posting signs.  Through this approach the expert identified a number of ways the hospital had fallen short in implementing its program.  Id. at 1076.

The trial court granted the defendants' motion for summary judgment.  On appeal, the plaintiffs maintained that the record could support a finding that the defendants negligently

24

implemented the program of security that the hospital voluntarily had chosen to implement.  Id.
at 1071, 1075-76.

The Superior Court held that the plaintiffs failed to provide sufficient evidence to
establish that notice was imparted to the hospital or the security firm of a particular threat of
third-party criminal violence to its tenants or their invitees.  Consequently, the case could not be
analogized to the setting where merchants have a duty to prevent or warn their patrons of such
harm.  Id. at 1076.[5]

Kerns also sought to establish that the hospital and security firm "failed to exercise
reasonable care with regard to their voluntary undertaking to provide a program of security on
the Hospital grounds."  Id. at 1077.   They argued that the program actually implemented was
unreasonable in that it was inadequate.

The Superior Court acknowledged that the hospital was a landlord that through its agent
unquestionably had offered a program of security to the tenants of the nurses' residence and their
invitees, such as Kerns.  Id.   The hospital thus had a duty to exercise reasonable care with
respect to that program.  Id.

Following the teachings of Feld, the Superior Court held that the plaintiffs' evidence
seeking to show that the security program as implemented was inadequate misapprehended the

---

[5] In a lengthy footnote the court further observed that there where "significant public policy
questions relating to the wisdom of privatizing police functions, the proper allocation of the costs
of violent crime, the impact of uncertain and/or expensive security requirements on urban
business districts and urban economies, as well as practical questions relating to the adequacy of
alternative security regimes which all must be considered in determining the extent to which
'reasonableness' on the part of merchants in response to the threat of third party criminal conduct
may require merchants to secure or even militarize business properties open to the public in high
crime areas."  Id. at 1076 n. 4.  It further opined that it was "far from clear" that the duty
recognized in the line of cases applying section 344 could be imposed on a non-profit hospital in
light of the teachings in Feld that such a duty has no application to places that are "not a public
resort where one who profits from the very public it invites must bear what losses that public
may create."  Id. (quoting Feld, 485 A.2d at 745-46).

nature of the burden imposed incident to such an undertaking and mistook the type of reasonable care required with regard to the security program actually offered.  Id.  The fact that neither the roving guard nor the guard assigned to watch the alternating closed circuit monitors detected the assault or noticed the assailants in time to prevent it was not evidence of negligence "on their part with regard to the limited program of security actually offered."  Id.  Nor was negligence established by the fact that the guard did not appear to raise the gate when Kerns approached and blew his horn.  Id.  Neither of these alleged shortcomings were sufficient to demonstrate negligence within the boundaries of the particular security program in place.  Id.  Kerns' expert focused on the inadequacy of the program as implemented rather than a negligent failure within the program.  Id.  Thus, the Superior Court surmised that "[t]he parties appear to agree that the program of security actually implemented simply was not designed to prevent such sudden assaults" and concluded that there was no evidence of any negligence by the security firm with regard to the program actually offered.  Id. at 1078.

In contrast, the Superior Court held that the type of conduct that will support a claim of negligence under Feld was present in Reider v. Martin, 519 A.2d 507 (Pa. Super. 1987).  There, tenants repeatedly complained to their landlord about a lock on the front door of a multiunit apartment building.  In response, the landlord told the tenants the repair would be made.  The repair remained to be performed when the plaintiff was raped, beaten and robbed in the stairwell outside her apartment.  Id. at 508.  After two days of trial on notice of the defective lock, the assurances that the lock would be repaired and the failure to do so, the trial court granted a nonsuit on the basis that no program of security had been offered within the meaning of Feld.  It reasoned that the landlord had not held itself out as a provider of security and a landlord's duty to protect against the criminal acts of third parties does not arise unless he or she undertakes to

26

provide extra precautions.  Id. at 508, 510.  Consequently, it concluded that the general no duty rule mandated the nonsuit.

After thoroughly examining Feld, the Superior Court reversed.  It held the trial court had interpreted the phrase "program of security" too narrowly and opined that whether such a program exists is based on "whether or not the program promises to provide an additional factor of safety [which] is a substantive analysis." Id. at 510-11.  It further reasoned that while a secured outside door did not initially appear to be a program of security, and the landlord had no preexisting duty to supply the tenants with a front door that locked, the landlord assumed such a duty by consistently promising to repair the lock.  This assurance was a tacit agreement "to provide the tenants with a method by which they could have monitored those people who gained access to the interior of the apartment building." Id. at 511.  In failing to make the repair, the landlord denied its tenants "the greatly enhanced level of security that such an elementary undertaking would have provided." Id.

The court further observed that in keeping with the mandates of Feld, the tenants "could only expect the same quality and type of protection that the second locked door would have provided and nothing more." Id.  But the landlord did not supply this benefit which after repeated assurances the tenants had a right to reasonably anticipate.  Accordingly, the case was remanded to permit the jury to determine whether the landlord (1) undertook a duty to provide a functional lock and (2) breached that duty and (3) whether any such breach was a substantial factor in bringing about the plaintiff's injuries.  Id.

In Ashaolu, the Superior Court upheld Judge Folino's determination that no duty arose under section 323.  Ashaolu v. Duquesne University of the Holy Spirit, No. 379 WDA 2010, March 27, 2012 (Doc. No. 68-3) at 15-17.  Judge Folino held that Duquesne did not undertake to

provide a level of security that was designed to create a gun-free environment. Because it did not commit to such an undertaking, any asserted deficiency in what was provided would fail because Duquesne had a history of relative tranquility on campus and Sam Ashaolu could not have reasonably relied upon the security provided to eliminate all possibility that a handgun would be brought onto campus and/or into the dance; nor could he reasonably rely on it to expect that the campus grounds would remain weapons-free. Ashaolu v. Duquesne University of the Holy Spirit, 2012 Pa. Dist. & Cnty. Dec. LEXIS 231 at *34-36.

The Superior Court acknowledged that Duquesne had undertaken to provide a significant level of campus security and to exercise reasonable care in providing that security.  And this included the fact that Duquesne had in place a comprehensive security network and that public safety department approval was needed where a student-organization event was advertised beyond the university community "so as to ensure necessary security for the event." Ashaolu v. Duquesne University of the Holy Spirit, No. 379 WDA 2010, March 27, 2012 (Doc. No. 68-3) at 16.  It nevertheless rejected the notion that the duty owed under the circumstances could be defined as one to provide security. Id. at 16-17.  Instead, it viewed the question as whether Duquesne had a duty to protect Ashaolu "from the specific harm suffered, i.e., the spontaneous third-party criminal shooting." Id. at 17.  It construed the plaintiff's proof of a breach as seeking to establish that additional security or a different program might have prevented the harm, a showing that was inadequate to create a duty under Feld. Id.

Other courts likewise have heeded the restrictive teachings laid down in Feld.  In Salamone v. The Catholic Archdiocese of Philadelphia, et al., 1995 WL 1316037 (November 29, 1995), the plaintiff sued the defendant for injuries she sustained after she was denied admission to a school dance and then raped by a third-party as she was trying to gain entrance into the

28

dance.  Father Judge High School is a private high school for boys located in Northeast

Philadelphia and is operated by the Archdiocese of Philadelphia.  It held a dance open to those

high school students who had a valid identification card, were dressed appropriately and had paid

a nominal admission fee.  School policy required that any student who showed signs of drug or

alcohol consumption be denied admission into the dance.

About twenty parents volunteered to chaperon the dance.  In addition, members of the

Father Judge faculty, administration and clergy were present to act as chaperons.  The chaperons

were stationed at the front door and throughout the dance.  The police were given advanced

notice of the dance and on the night in question they patrolled the neighborhood with increased

frequency.

The plaintiff was from New Jersey and had decided to attend the dance with her

boyfriend, who was a student at Father Judge.  She and her boyfriend consumed alcohol before

going to the dance.  The plaintiff was denied admission at the front door because she was

suspected of drinking.  She was not intoxicated.  She attempted to gain access by traversing

around the building looking for a side window or door to enter.  As she was walking around the

building a third party, Brian Cohen, approached her and told her he could help her get in because

he was a school janitor.  He and the plaintiff walked a short distance from the school and toward

a local park.  Cohen told the plaintiff to step into the park when he spotted a police car in the

vicinity.  Cohen then raped the plaintiff.  She thereafter escaped, returned to Father Judge, and

gained admission.  The police were called and Cohen was arrested, tried and convicted.  Id. at 1-

2.

Judge Nigro viewed the central issue as whether Father Judge had a duty to the plaintiff.

Id. at 2.  He reasoned that it did not because the rape happened off school grounds, but further

opined that even if the assault could sufficiently be connected to the school grounds, the Archdiocese did not owe a duty to protect the plaintiff from the criminal acts of third persons. Id. at 2-3.

The plaintiff advanced the full litany of grounds for establishing a duty: "that Father Judge owed a duty to her as a business invitee, as *in loco parentis*, in undertaking a security program, and in providing adequate protection against the intentional criminal acts of a third person." Id. at 2. Judge Nigro found the predicate facts necessary to create a duty under Pennsylvania law for each of these theories to be insufficient as a matter of law. First, a "broad spectrum of the public" was not invited to the dance. Id. at 4. And neither the fact that Father Judge extended an invitation to other high school students and their guests or the fact that the school charged an admission fee was sufficient to change the character of the event from a private setting into one that was open to the public. Id. Because Father Judge was not open to the public, it "had no duty to provide a program of security for [its] premises or the surrounding neighborhood." Id.

Second, the fact that the school notified the police in order to increase security and gain extra police with trained canine on its grounds during the dance did not give rise to any duty that was breached. Id. at 5-6. To the contrary, Judge Nigro held that plaintiff's evidence and arguments to the effect that Father Judge could have done more by way of providing security or could have implemented what was undertaken in a more efficient manner was not enough to create or give rise to a duty to do so. He reasoned that both Feld and Kerns reject such an approach. Id. at 5-6.

Third, the school's decision to host a dance did not create any special relationship between the plaintiff and Father Judge. Thus, the school did not owe a duty as *in loco parentis*. Id.

Finally, Judge Nigro rejected the notion that the circumstances gave rise to a duty to provide adequate protection against the spontaneous criminal acts of third parties.  He opined:

> The courts have refused to impose on landowners a duty to protect against the criminal conduct of third parties occurring on private premises to which the general public has not been invited.  Feld.  The premises of Father Judge are not a place to which the general public is invited to come, either generally or on the night in question.  As with the apartment complex in Feld, and the private hospital campus in Kerns, the buildings and grounds of Father Judge are not open to the public.  As such the Archdiocese did not owe a duty to the plaintiff.

Id. at 6.  Thus, the court held that the principles of Feld precluded the imposition of a duty on the school and granted summary judgment to the defendants.  Id.

A review of the pertinent precedent reveals that the restrictive principles laid down in Feld continue to be the controlling law of Pennsylvania.  The Supreme Court of Pennsylvania has not revisited or otherwise modified the basic principles set forth therein.  The Superior Court and the lower courts have consistently followed its restrictive approach to the scope of section 323 where the risk of injury for which protection is sought is not predicated on a physical defect in the landowner's property but instead on the unpredictable and spontaneous criminal acts of third parties.  Thus, there is no basis to predict that the Supreme Court is poised or set to change course in its jurisprudence applying section 323.

Here, at least two of the restrictive principles of Feld mandate that defendant did not owe a duty to plaintiff to prevent or protect him from being shot by Holmes and Lee.  First, consistent with the very nature of the doctrine of negligence, the harm for which protection or prevention is sought must follow a reasonable expectation of that harm.  Feld, 485 A.2d at 745-47.[6]  Establishing such an expectation cannot be predicated on the common expectation that the

---

[6] This principle is inherent in the very concept of negligence.  See Feld, 485 A.2d 745 (The general rule holding landlords have a duty to protect tenants from injury is grounded in a failure of care caused by their own negligence: permitting a condition, the cause of which is either

criminal can be found in all faucets of modern society.  Id. at 745.  A level of expectation

significantly above this common experience is needed - such as (1) that akin to holding the

premises open to all for a business purpose or (2) undertaking to provide a measure or system

of protection against a form of harm or injury and having notice of (a) the repeated

reoccurrences of injury traceable in part to certain uses to which the property has been put and

(b) a reasonable expectation by the users of the property that simple measures that could

eliminate or minimize that risk of injury will or are being provided, followed by the careless

failure to provide such measures.  Plaintiff cannot satisfy this basic tenant of Feld.

Plaintiff has not sought to establish a duty under § 344, presumably because of the state

courts' thorough treatment of that approach in Ashaolu.  The argument that Jones and even

other BSU members believed that anyone from the public could attend the dance does not

supply the level of invitation needed to create an undertaking akin to an entrepreneurial venture

dependent upon constant interaction with the public.  The landlord in Feld had every reason to

expect that tenants would invite guests on to the leased property and even strangers would be

there on occasion.  The hospital had the same expectations in Kerns.  The school in Salamone

was aware and sanctioned the invitation to its own and other high school students and their

guests.  All of these courts recognized that such occasional interaction with invitees not

normally on the property does not give rise to a reasonable expectation that all may appear and

all may not behave.  Plaintiff's effort to rely on the permitted invitation used by the BSU to

---

known or knowable by reasonable precaution and then perpetrates that risk of injury by failing to
remediate the condition.).  It also is reflected in the text of section 323 by providing that one who
undertakes "to render services" cannot be liable for such an undertaking unless among other
things "*he should recognize*" the service as necessary for the protection of the other's person or
property.  Restatement (Second) of Torts § 323 (emphasis added).

create a basis for notice to defendant giving rise to a reasonable expectation that the felonry that befell plaintiff would occur is misplaced.

Plaintiff's attempt to create a reasonable expectation of the harm that befell him from the prior criminal incidents on Duquesne's campus is unavailing. Plaintiff points only to two incidents that involved a handgun. These were over a year apart from one another and the closest one was over a year prior to the dance. There is no evidence of defendant experiencing frequent or even repeated episodes of criminal assaults on campus by unaffiliated third parties during past similar events such as dances, carnivals, sporting events, cultural programs and other sponsored events. The two other assaults reported in defendant's Clery Act reports did not involve a handgun or conduct similar to that which occurred on September 17, 2006. Duquesne's Clery Act reports do not show any aggravated assaults occurring on campus for 2006 prior to the shooting. It follows that defendant's prior experience did not give rise to a reasonable expectation that the type of harm that occurred would occur from the use to which the property was put.

Plaintiff's use of the statistical analysis employed by his expert to impute equivalent notice and a reasonable expectation of such harm from that notice is disingenuous. Judge Folino made the following observations about defendant's campus:

> Duquesne University is a Catholic University founded by the members of the Congregation of the Holy Spirit, and located, for the most part, within a section of Pittsburgh known as the Bluff; steep hills effectively isolate Duquesne's campus -- and render the campus distinct -- from the surrounding Pittsburgh neighborhoods. This isolation is also reflected in the comparative crime rates: as opposed to the relatively high crime rates found within the surrounding neighborhoods, the campus of Duquesne exists in a state of relative peace. Compare "Zone 2 Crime Statistics," attached as "Exhibit '15'" to "Exhibits to Plaintiff's Brief in Opposition to Motions for Summary Judgment" (hereinafter "Zone 2 Crime Statistics") with "Clery Act Statistics" of Duquesne University, attached as "Exhibit 'D'" to Defendant's "Motion for Summary Judgment" (hereinafter "Duquesne's Clery Act Statistics"), at 46-51.

Certainly, throughout its history, Duquesne has never had an incident on campus that was anything remotely similar to the shooting of September 17, 2006. Ashaolu, 2010 Pa. Dist. & Cnty. Dec. LEXIS 231 at *26.  The Superior Court agreed, reiterating that despite the turmoil that may exist in the adjacent neighborhoods, "Duquesne's campus exists in a state of relative peace."  Ashaolu v. Duquesne University of the Holy Spirit, supra (Doc. No. 68-3), at 12.

Apparently viewing the crime statistics as vulnerable to a similar analysis in this court, plaintiff only supplied the report from his expert.  It merely sets forth a statistical comparison of the CAP Index statistics drawn from Zone 2 to all of Allegheny County and all of the Commonwealth of Pennsylvania.  None of the underlying data upon which the comparison was based has been presented to this court.  One sentence alluding to the fact that the expert's comparison was based on this general data was included in plaintiff's brief in opposition.  In addition, one reference is made to the deposition of the expert, but the deposition likewise was not submitted for this court's review.  See Plaintiff's Brief in Opposition at 14 n.4.

Seeking to establish an increased risk of crime through such means does not supply competent evidence to prove defendant had notice that gave rise to a reasonable expectation that the type of harm that occurred would occur from the use to which the property was put.  To the contrary, even looking past the shortcoming of failing to submit the information in a form of evidence that could be used for such purposes, such general statistics and analyses merely support and confirm the general proposition noted in Feld: "[t]he criminal can be expected anywhere, any time, and has been a risk of life for a long time.  He can be expected in the village, monastery and the castle keep."  Feld, 485 A.2d

at 745.  Such a showing does not supply a reasonable expectation that the type of harm in

question had an increased likelihood of occurring on defendant's property such that the

failure to prevent or protect against it can be said to be a form of negligence.

Finally, plaintiff's evidence is insufficient to establish that defendant gained such

an expectation from the events that unfolded on September 16, 2006.  As part of his

argument that defendant is liable for the supposed negligence of the BSU, plaintiff posits

that "[t]he BSU is part of Duquesne and, thus Duquesne is liable for the actions of the

BSU.  Similarly, the BSU is an agent of Duquesne and, on that basis, Duquesne is also

responsible for the actions of the BSU."  Plaintiff's Brief in Opposition at 24.  Plaintiff

asserts that there are four grounds upon which a jury could find that the BSU was an

agent of Duquesne and thus the purported knowledge and negligence of Gaskins can be

imputed to defendant: through expressed authority, implied authority, apparent authority

or authority by estoppel.

Plaintiff further asserts that the factual grounds that create a material issue of fact

about whether the BSU was a part or an agent of Duquesne arise from it being an

officially recognized and registered student organization with Duquesne.  Its purpose is

sanctioned, it is required to follow all of defendant's rules when sponsoring an on-campus

event, its finances are maintained in a University account, it has a campus office,

defendant's administrators sign the contracts which the BSU enters, it receives money

from the program council to sponsor its events, and its programs and events are approved

by defendant as being beneficial for students.

The BSU was neither an agent of defendant or an extension of it.  "It is a

fundamental principle of agency that for a principal to be liable to third parties for the

acts of the agent, an agency relationship must first be established." <u>SEI Corp. v. Norton & Co.</u>, 631 F. Supp. 497, 501 (E.D. Pa. 1986) (citing Restatement (Second) of Agency § 140).  Such a relationship can be established by "(1) express authority; (2) implied authority, to do all that is proper, usual and necessary for the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct; and (4) agency by estoppel." <u>Id.</u> (citing <u>Apex v. Financial Corp. v. Decker</u>, 369 A.2d 483, 485 (Pa. Super. 1976)).

In seeking to establish that one has acted as the agent of another, "the burden of showing authority so to act lies on the person who avails himself of such acts in order to charge a third person as principal . . . . *Agency will not be assumed from the mere fact that one does an act for another.  The fact of agency must be established*." <u>Id.</u> (quoting <u>Reifsnyder v. Dougherty</u>, 152 A. 98, 100 (Pa. 1930) (emphasis added)).

"[T]he three basic elements of agency are: 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" <u>Basile v. H & R Block, Inc.</u>, 761 A.2d 1115, 1120 (Pa. 2000) (quoting <u>Scott v. Purcell</u>, 415 A.2d 56, 60 (Pa. 1980) (quoting Restatement (Second) of Agency § 1, Comment b (1958) and citing <u>Reid v. Ruffin</u>, 469 A.2d 1030, 1033 (Pa. 1983)).  "[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." <u>Id.</u> (quoting <u>Smalich v. Westfall</u>, 269 A.2d 476, 480 (Pa. 1971)).

Plaintiff has not offered any evidence that would support a finding that defendant manifested an intent to have any member of the BSU to act as an agent in supplying personal security for those in attendance at the dance.  Nor has he proffered evidence that

will support a finding that Duquesne vested such authority in the BSU such that it had implied authority to provide such services. To the contrary, Duquesne required the BSU to obtain advanced approval for the bash in order for Duquesne to provide two police officers for the event. This requirement and arrangement were part of the established protocol necessary for the BSU to sponsor and hold the dance.

Similarly, permitting a BSU member to greet guests and assist in the collection of the admittance fee simply cannot bear the weight of supporting a finding that Duquesne held Gaskins out as an individual responsible for maintaining security against the threat of violence or similar acts at the dance or throughout campus grounds on that night. There is no evidence that Duquesne sought to vest such authority in any member of the BSU. There is no evidence that any member of the BSU undertook any action to provide security beyond maintaining responsibility for the funds that the BSU collected at the door. Duquesne required and provided two uniformed officers who were present at the dance and moved throughout the Student Union ballroom that night. These undisputed facts sufficiently undermine any notion that Gaskins or any other BSU member was an agent of Duquesne for the purpose of providing security.

Nor will the record support a finding that Duquesne had such control over the BSU's presentation of the dance that the BSU effectively became its agent. Plaintiff appears to assert that Duquesne had a sufficient degree of control over the BSU's presentation of the dance to make the BSU the alter ego of defendant.[7] To the contrary,

---

[7] The alter ego theory is used to piece the separate existence of a business entity where it has been used for some improper purpose. First Reavest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 604 (Pa. Super. 1991). It also may be used where one entity has used another to advance its own interests. Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co., 53 A3d 53, 58 (Pa. Super. 2012). In order to establish personal liability in such a setting the one seeking to pierce

the record unequivocally shows that the BSU had independent control over the purpose

and theme of the dance as well as the funds generated therefrom.  It was sponsored solely

to further the BSU's charitable and educational purposes.  The BSU had a First

Amendment right to advance its interests in building a sense of community and educating

the broader campus about African American culture.  See e.g., Healy v. James, 408 U.S.

169, 181-82 (1972) (subject to reasonable campus regulation, student organizations enjoy

First Amendment rights of association and speech and the doctrine of prior restraint

precludes adverse treatment of such organizations based on content of message or

disagreement with the organization's philosophical or social agenda).  There is inadequate

evidence to support a finding that Duquesne so controlled the actions of the BSU that it

became a mere extension of the University and therefore its agent for the purposes of

sponsoring and holding the dance.

It follows that any actual or implicit notice to any member of the BSU that Lee

and/or Holmes had weapons cannot be imputed to defendant under any viable theory of

agency.  It likewise follows that any such notice to the BSU on September 16, 2006, fails

---

the separate entity's existence must show the person or entity "in control of a corporation [used] that control, or [used] the corporate assets, to further his [/its] . . . own personal interests . . . ." Id. (quoting Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978).

"Pennsylvania law has a strong presumption against piercing the corporate veil." Id. (citing Lumax Industries, Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995). Any inquiry in this area starts "from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." Id. (quoting Wedner v. Unemployment Compensation Bd. of Review, 296 A.2d 792, 794 (Pa. 1972).  Proving one entity was the alter ego of another requires proof (1) that the entity exercised domination and control over the other; and (2) that injustice will result if the separate identity is maintained despite unity of interests between corporation and its principal. Id.  (citing Ashley, 393 A.2d at 641).

Here, the BSU was an unincorporated association under Pennsylvania law.  See Ashaolu, 2010 Pa. Dist. & Cnty. Dec. LEXIS 231 at *53.  And as further explained infra, there is insufficient evidence to prove that Duquesne exercised domination and control of the BSU to the extent they became inseparable entities.

to provide a basis from which a finder of fact could conclude that defendant had notice that gave rise to a reasonable expectation that the type of harm that occurred on September 17, 2006, would occur from the use to which the property was put.

Plaintiff has failed to proffer sufficient evidence to permit a finding that defendant had any form of notice that should have created a reasonable expectation within the meaning of <u>Feld</u> that the type of harm for which protection is sought would occur from the use to which the property was put.  This showing strongly counsels in favor of the general no duty rule and against the recognition of the duty plaintiff seeks to establish.

Plaintiff likewise cannot satisfy a second restrictive principle established in <u>Feld</u>. Where a landowner voluntarily undertakes to provide some measure or program of security for the protection of another's person, the landowner has a duty to provide what has been undertaken with due care.  This duty extends only to what has been offered and the other cannot expect more than the benefits reasonably expected of the measure or program as made available.  A showing that what was provided could have been better administered or undertaken in a more effective manner fails to supply a breach of this limited duty and seeks to establish a duty that the law of Pennsylvania does not recognize.  Plaintiff has failed to advance evidence to support a breach of this limited duty.

Plaintiff argues that defendant breached its duty to provide security in myriad ways.  His expert identifies the following bases to support a finding that the security employed on September 17, 2006, failed: failing to deploy properly one of the off-duty officers at the entrance to the dance; improperly delegating to students the responsibility to provide security at the entrance to the dance; failing to instruct the off-duty officers

39

about their duties during the event; have a uniformed officer present at the entrance to the

dance; failing to provide the BSU students with basic security training or instructions;

failing to provide the public safety officers with crowd control training; failing to employ

a hand-held metal detector at the entrance to the dance; failing to develop pre-event,

event and post-event phases of security and deploy each phase to its fullest effectiveness;

and failing to execute an effective post-event plan that would have maintained visible

police presence throughout Academic Walk as the crowd was dispersing.

Each of the above measures or deficiencies in defendant's program of security is

based on an expert assessment in security that what was provided (1) was not adequate

for the situation that confronted defendant or (2) could have been provided more

effectively.  Such a showing does not breach a cognizable duty under Pennsylvania law

because it is not based on an expectation of the reasonable benefits of what was offered.

Plaintiff has not provided evidence to show that any of these measures were routinely

employed by defendant at similar events and those who attended such events had

developed reasonable expectations that such measures would be taken on the night in

question.  As such, these measures and deficiencies seek to predicate a breach of duty on

the theory that what was provided was inadequate and could have been better

administered or more effectively deployed.  Feld and its progeny consistently hold that

such a showing does not breach a duty that is recognized under Pennsylvania law.

Plaintiff's efforts to establish a breach of duty based on the number of on-duty

officers on campus that night and the manner in which all of the officers available were

deployed during and at the end of the dance is deficient for the same reasons.  Plaintiff

makes much of the following regarding Duquesne's utilization of its security force (or the

40

lack thereof): the number of officers employed/utilized was not sufficient to provide the

coverage Duquesne undertook to provide; it was a BSU student who was present and

greeting guests as they arrived, and there was no formal security officer at the entrance;

in the early morning hours of September 17, 2006, there were fewer than the seven

officers and one security guard on campus called for in the staffing section of Duquesne's

Department of Public Safety Policy on Campus Safety and Security; there were only four

"on-duty" security officers actually deployed in escorting the crowd after the dance

ended; two of the four officers deployed joined together during the post-event security

while another stayed at the Student Union to "guard the money;" the officers permitted

the crowd to advance in front of them and thereby failed to maintain direct sight/visual

presence throughout the time the crowd was traversing down Academic Walk; and a

correct plan would have prevented the shooting by (1) having a uniformed officer present

at the entrance, thereby deterring Holmes and Lee from entering with weapons and (2)

providing uniformed, armed officers with a continuous line-of-sight along the entire exit

route, including where the shooting occurred, thereby deterring Holmes and Lee from

drawing their concealed handguns and shooting plaintiff and his teammates.

 Plaintiff has failed to establish that at prior student-sponsored campus events

defendant provided more or better security than what was provided that night.  There is

no evidence that defendant routinely or even occasionally offered (1) the consistent

presence of a uniformed officer at the entrance of a student-sponsored event; (2) the

actual presence of more than four on-duty officers and/or continuous line-of-sight/visual

presence by uniformed officers during the escorting of the students back to the

dorms/buses following such an event; (3) a different utilization of the four duty officers,

two uniformed off-duty officers and one security guard who were involved with the procedures employed at the end of the dance and (4) so forth.  In other words, plaintiff has failed to demonstrate that he or any other student had reasonable expectations that something more than what was provided would be provided based on what routinely had been provided with regard to the two focal points: the entrance to the dance and the escorting of the crowd back to the dorms/bus stop.  Consequently, these grounds for breach seek to impose liability based not on the negligent failure to act with due care with regard to the program of security that had been provided, but on expectations of more or better benefits than can reasonably be expected from the program as offered.  Pennsylvania law does not recognize a duty to provide such benefits.

Plaintiff's reliance on section 314A of the Restatement also is unavailing.  Plaintiff argues that a duty was created pursuant to section 314(A)(3) because defendant opened its campus to the public by permitting the BSU to invite students and non-students to the dance and defendant's basketball coach told plaintiff and his teammates to go to the dance.  He further argues that defendant knew that the BSU was holding the dance and inviting the public, knew that the circumstances gave rise to a need for heightened security, had the ability to control the actions of the BSU and the risks it was creating by sponsoring the dance, and had the opportunity to exercise control over the entire event.  Plaintiff thus contends that defendant had a duty under section 314(A)(3) to protect him against unreasonable risk of physical harm because essentially he was there at defendant's invitation and defendant had the ability and opportunity to control the unreasonable risk of harm created by the BSU's use of the property.

Section 314A provides that:

42

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Restatement (Second) of Torts, § 314A.  Pennsylvania courts have adopted the main text of section 314A. See Midgette v. Wal-Mart Stores, Inc., 317 F. Supp.2d 550, 558 (E.D. Pa. 2004).

The main text of section 314A "lists certain special relations which give rise to a duty to aid or protect third persons, including duties on common carriers, innkeepers and possessors of land." Johnson v. Johnson, 600 A.2d 965, 972 n. 8 (1991), *superseded by statute on other grounds*, Pa. R. Civ. P. 1035.2, 1035.3.  These special relationships may give rise to duty to act affirmatively to protect another.  Allen, 669 A.2d at 362.

Comment (f) sheds light on the duty contemplated by this section and delineates when such a duty arises.  It provides:

The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances.  In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.  He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and apparently in a position to give him all necessary assistance.

Restatement (Second) of Torts, § 314A comment f.

Defendant maintains that it did not have a pre-existing special relationship with plaintiff that gave rise to duty to protect him from the criminal acts of others and it did not have notice or prior knowledge that gave rise to a duty to do so under section 314A. We agree.

As noted above, any relationship between defendant and plaintiff as university/student did not give rise to a pre-existing duty to protect plaintiff from the spontaneous criminal acts of third persons. See e.g. Bradshaw, 612 F.2d at 1213. Further, in Pennsylvania there is no general duty on a landlord to protect tenants against criminal intrusion unless such liability has been established through "a judicial rule for given limited circumstances." Feld, 485 A.2d at 745.

Plaintiff cannot demonstrate that defendant had constructive or actual notice that created a reasonable expectation that the type of harm that befell plaintiff would occur from the use to which the property had been put. The invitation to others was not on the level needed to provide the notice that attaches with an invitation to all under section 344 of the Restatement and the courts consistently have rejected the proposition that an invitation to tenants, their guests and even the public on an occasional and non-commercial basis gives rise to the type of notice that accompanies a continuous invitation to all for entrepreneurial gain. Duquesne's prior experiences with crime on campus did not give rise to a reasonable expectation that the type of harm that occurred would occur from the use to which the property was put. Finally, plaintiff has not supplied evidence to establish that defendant gained such an expectation from the events that unfolded on September 16, 2006.

It follows that plaintiff cannot establish that defendant knew or had reason to know that plaintiff was at risk of physical harm within the meaning of section 314A(3) at any time prior

44

to when Lee and Holmes decided to pull handguns and shoot plaintiff and his teammates as they were walking away.  The inability to prove defendant had actual or constructive knowledge of plaintiff being endangered by the potential for such peril precludes the submission of plaintiff's section 314A(3) claim to a jury.

Finally, the general factors that guide an analysis of whether a duty should be recognized in any particular case counsel against placing a duty on defendant to protect plaintiff from the felony that befell him under the circumstances as they existed.  The relationship between the parties does not provide a basis for an exception to the general no duty rule.  Recognizing a duty pursuant to the bases advanced "would effectively require landlords to be insurers of their tenants' safety: a burden which could never be completely met given the unfortunate realities of modern society."  Feld, 485 A.2d at 476.  The social utility of imposing a duty on a landowner to take all reasonable measures to satisfy such an endless undertaking cannot be readily ascertained or understood.  The nature of the risk would be both great and ever present as the criminal can generally be expected in all facets of modern society.  Id. at 475.  The consequences of imposing such a duty would divert tremendous resources from defendant's primary mission and in turn would impede its ability to advance a campus experience that includes broad exposure to cultural and social diversity.  Finally, society has a great deal of interest in preventing the conduct that led to plaintiff's injuries; nevertheless, the elected officials of Pennsylvania have not sought to place that responsibility on entities other than the public servants who are charged with that duty.

It cannot be questioned that plaintiff suffered a serious injury and has experienced a significant level of trauma and harm from the events that unfolded on September 17, 2006.  And since that time every parent of a student at school savagely has been reminded of the

importance of campus security in today's world. The need for it cannot be understated or reduced to something less than a high priority. But the law recognizes that as a general matter redress for injury from such behavior is reserved to the measures of collective society and responsibility for such barbarous and heinous acts can be imposed only under limited circumstance which are not satisfied here.

Because defendant did not have a duty to prevent or protect plaintiff from the spontaneous, criminal shooting that occurred on September 17, 2006, under the then-existing circumstances, defendant is entitled to summary judgment.[8]

---

[8] Assuming for the sake of argument that defendant did owe a duty to provide security as advocated by plaintiff, defendant still would be entitled to summary judgment because plaintiff cannot show that defendant's breach of any such duty was the proximate cause of his injuries. In order to establish the element of causation, a plaintiff must prove that the breach was "both the proximate and actual cause of the injury." Lux v. Gerald E. Ort Trucking, Inc., 887 A.2d 1281, 1287 (Pa. Super. 2005). Proximate cause is defined as "a wrongful act which was a substantial factor in bringing about the plaintiff's harm." Dudley v. USX Corp., 606 A.2d 916, 923 (Pa. Super. 1992). Actual causation refers to "cause in fact" or "but for" causation, which provides that "if the harmful result would not have come about but for the negligent conduct then there is a direct causal connection between the negligence and the injury." First v. Zem Zem Temple, 686 A.2d 18, 21 (Pa. Super. 1996).

Proximate and actual causation are "separate and distinct concepts." First, 686 A.2d at 21. Proximate causation, or legal causation, is a determination that "the injury sustained is of such a nature that it is socially and economically desirable to hold the wrongdoer liable." Id. This aspect of proximate cause is a legal question that must be established before the issue of actual causation can be submitted to the jury. Reilly v. Tiergarten Inc., 633 A.2d 208, 210 (Pa. Super. 1993) (trial court's failure to make legal determination of proximate cause before sending case to jury constituted error). Making this threshold determination is crucial because "[e]ven where harm to a particular plaintiff may be reasonably foreseeable from the defendant's conduct, and that conduct is the cause-in fact of the plaintiff's harm, the law makes a determination that, at some point along the causal chain, liability will be limited." Alumni Ass'n, Delta Zeta Zeta of Lambda Chi Alpha Fraternity v. Sullivan, 535 A.2d 1095, 1098 (Pa. Super. 1987) (At a certain point in the causal chain of events "negligent conduct will be viewed as too remote from the harm arising to the plaintiff, and thus not a substantial factor in bringing about the plaintiff's harm.").

An analysis of proximate cause essentially is two-fold. First, the court determines whether "the alleged negligence was so remote that as a matter of law, the defendant cannot be held legally responsible for the subsequent harm." Holt, 932 A.2d at 921. This requires an assessment of whether "the injury would have been foreseen by an ordinary person as the natural

Date: March 30, 2013

                              s/ David Stewart Cercone
                              David Stewart Cercone
                              United States District Judge


cc:    Teresa C. Toriseva, Esquire
       Kathy Brown, Esquire
       Frederick W. Bode, III , Esquire
       Steven W. Zoffer, Esquire

       (*Via CM/ECF Electronic Mail*)

---

and probable outcome of the act [in question]." Id.  Only when "it appears to the court highly extraordinary that the actor's conduct should have brought about the harm" will the actor's conduct be determined not to be a legal cause of that harm.  Id.

    Second, if the alleged negligence was not "so remote" and the injury "would have been foreseen by an ordinary person as the natural and probable outcome" of the negligent act, the issue is submitted to the jury, which then determines whether the negligent act was a but-for cause of the harm  and a "substantial factor" in producing the harm.  See Rabutino v. Freedom State Realty Co., Inc., 809 A.2d 933, 941 (Pa. Super. 2002) ("Whether a defendant's conduct [was] a 'substantial factor' in causing plaintiff's harm is ordinarily a question of fact for the jury."); see also Novak v. Jeannette Dist. Memorial Hosp., 600 A.2d 616, 618 (the determination of whether a negligent act constitutes the cause-in-fact is an issue for the fact-finder).

    Pennsylvania has declined to recognize that the common experience of criminal conduct throughout modern society provides notice that such conduct is foreseeable to an ordinary person as the natural and probable outcome of a landowner permitting his tenants to invite others on the property on an occasional basis.  The same analysis that precludes plaintiff from showing that defendant had constructive or actual notice that there was a reasonable expectation that the shooting would occur from the use to which defendant's property had been put also precludes plaintiff from establishing that "[the shooting of plaintiff] would have been foreseen by an ordinary person as the natural and probable outcome of [any of the bases advanced by plaintiff]" to establish defendant was negligent.  Compare Midgette, 317 F. Supp.2d at 566 ("If the people closest to the situation could not have anticipated it, we cannot expect that Wal–Mart could foresee Bryan's actions, or that its failure to call the police, maintain the kind of spousal abuse policy that Plaintiff believes it should have, or prohibit the sale of commonly-used and sold ammunition to someone with no restrictions on his ability to purchase firearms or ammunition, would have prevented the shooting.  Certainly, no reasonable jury could find that the shooting 'would have been foreseen by an ordinary person as the natural and probable outcome' of Defendant's failure to carry out the above tasks."); Kerns, 574 A.2d  at 1078 ("Moreover, there is also no evidence in this record demonstrating that any such negligence proximately caused the injury Mr. Kerns suffered.").  Consequently, defendant is entitled to summary judgment on this alternative basis as well.